TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922 Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

February 26, 2019

Michael I. Schneck, Esq.
Schneck Law Group LLC
301 South Livingston Avenue, Suite 105
Livingston, New Jersey 07039

Richard M. Conley, Esq.
Richard M. Conley, LLC
122 Main Street
P.O. Box 662
Flemington, New Jersey 08822

>    Re:    Warren Lumber Inc. c/o Warren Millwor and
>    Empire TFI Jersey Holding LLC v. Washington Borough
>    Docket Nos. 004276-2013 and 002647-2014

Dear Mr. Schneck and Mr. Conley:

This letter constitutes the court's opinion following trial of local property tax appeals filed by plaintiffs, Warren Lumber Inc. c/o Warren Millwor and Empire TFI Jersey Holding LLC ("plaintiffs"). Plaintiffs challenge the 2013 and 2014 tax year assessments on improved property located in Washington Borough, Warren County, New Jersey.

For the reasons stated more fully below, the court reduces the 2013 and 2014 tax year assessments.

## I.    Procedural History and Findings of Fact

As of each valuation date, plaintiffs were the fee simple owner, or holder of a tax sale certificate for the real property and improvements located at 256 Belvidere Avenue, Washington

Borough, New Jersey.[1]  The property is identified on Washington Borough's municipal tax map as Block 35, Lot 14 (the "subject property").  For the 2013 and 2014 tax years, the subject property was assessed as follows:

Land:          $  296,200
Improvement: $1,361,800
Total:          $1,658,000

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for Washington Borough (the "Borough") was 78.44% for the 2013 tax year, and 80.85% for the 2014 tax year.  See N.J.S.A. 54:1-35a(a).  When the average ratio is applied to the local property tax assessment, the subject property had an implied equalized value of $2,113,717 for the 2013 tax year, and $2,050,711 for the 2014 tax year.

The subject property is an irregularly-shaped, 6.53 acre, or 284,447 square foot lot.  The site is improved with five buildings comprising a total of 68,540 square feet, allotted as follows: (i) a 2,900 square foot two-story multi-family residential dwelling with an attached one-car garage ("Building 1")[2]; (ii) a 17,764 square foot warehouse ("Building 2")[3]; (iii) a 11,324 square foot part-one and part-two story office facility ("Building 3"); (iv) a 22,734 square foot light industrial/warehouse building with supportive offices ("Building 4"); and (v) a 13,818 square

---

[1]  The "holder of a tax sale certificate, who has paid taxes from the time of acquisition of the certificate, is a 'taxpayer' under N.J.S.A. 54:3-21 and has standing to prosecute an appeal." Lato v. Rockaway Twp., 16 N.J. Tax 355, 358 (1997). Contra Northfield City v. Zell, 12 N.J. Tax 180 (Tax 1991).

[2]  The expert, as such term is later defined, offered testimony that the two-story multi-family residential dwelling is between 2,900 and 3,200 square feet.

[3]  Contradictory evidence was presented regarding the area of Building 2.  Page 1 of the appraisal report states that Building 2 is 17,764 square feet.  Page 21 of the appraisal report states that Building 2 is 17,664 square feet.  Page 94 of the appraisal report reflects that all buildings, excluding Building 1, comprise 65,640 square feet (17,764 + 11,324 + 22,734 + 13,818 = 65,640).  The court concludes that Building 2 comprises 17,764 square feet.

2

foot warehouse ("Building 5"). The subject property formerly housed Warren Lumber & Millwork, Inc. The property is serviced by public utilities including electric, natural gas, water, and sewer.

The subject property is located in the Borough's I - Industrial zoning district, with permitted uses that include business and professional offices, research laboratories, select industrial and manufacturing uses, coal and lumber yards, and other commercial uses permitted in the B-1, Highway Business, and B-2, Central Business, zoning districts. According to the expert (as defined herein), the subject property is a legal, non-conforming use, because residential dwellings are not permitted in the I - Industrial zoning district.

Aerial and surface photographs show that in the subject property's vicinity, Belvidere Avenue is a rural two lane roadway lined with residential dwellings. Building 1 fronts on, and is set back approximately 10 feet from Belvidere Avenue. Building 2 is constructed on an angle in the rear of, and partially beside Building 1. At certain points, Building 1 and Building 2 are located approximately 8-10 feet from one another. Building 3, is located along the subject property's northerly lot line, approximately 30 feet from Building 2, and set back approximately 50 feet from Belvidere Avenue. The remaining two buildings, Building 4 and Building 5, are located along the subject property's rear easterly property line, behind Building 2 and Building 3. The subject property's rear easterly property line abuts a Conrail – Erie Lackawanna railway line extension, which railway line seemingly ends at the subject property. On the other side of the railway line extension are a series of commercial buildings which, in turn, border Route 31.

In or about September 2010, U.S. Bank, as custodian for Empire Tax Fund 1, LLC, purchased Tax Sale Certificate #10-00017 from the Borough (the "Tax Sale Certificate"). On or about November 7, 2013, the Tax Sale Certificate was assigned to plaintiff, Empire TFI Jersey

3

Holdings, LLC.[4]  Empire TFI Jersey Holdings, LLC subsequently filed an action to foreclose Warren Lumber & Millwork, Inc.'s right of redemption under the Tax Sale Certificate.  On December 18, 2013, Final Judgment was entered by the Superior Court of New Jersey, foreclosing Warren Lumber & Millwork, Inc.'s right and equity of redemption in and to the subject property.[5]

According to the expert, in or about January 2014, the subject property was listed for sale or lease with a real estate agent.  On or about November 17, 2015, Empire TFI Jersey Holdings LLC sold the subject property to Falcon Group Investment LLC for consideration of $800,000.  In the expert's opinion, the sale of the subject property to Falcon Group Investment LLC was an arms-length transaction.

During trial, plaintiffs offered testimony from a State of New Jersey certified general real estate appraiser who, after voir dire, was accepted by the court as an expert in the property valuation field (the "expert").  The expert prepared an appraisal report expressing an opinion of the true market value of the subject property as of the October 1, 2012 and October 1, 2013 valuation dates.  The expert offered his opinion that the subject property had a true market value as follows:

| Valuation date | Expert's opinion |
| --- | --- |
| October 1, 2012 | $799,600 |
| October 1, 2013 | $799,600 |

[4]  The 2014 local property tax complaint identifies the plaintiff as Empire TFI Jersey Holding LLC.

[5]  The Final Judgment also named Jay L. Lubetkin, Esq., Assignee of Warren Lumber & Millwork, Inc., the New Jersey Economic Development Authority, PNC Bank, National Association, the Ad Hoc Committee of Unsecured Creditors of Warren Lumber & Millwork, Inc., and the State of New Jersey.

The Borough did not produce an appraiser during trial and offered no evidence of the subject property's market value as of the October 1, 2012 and October 1, 2013 valuation dates.

According to the expert, he conducted an exterior inspection of the subject property and took some photographs in the summer 2017.[6] A staff appraiser from the expert's appraisal firm inspected the interior of the subject property and took photographs in or about October 2017.

Building 1 is a multi-family residential dwelling, constructed in approximately 1965, consisting of two one-bedroom units and one studio unit. It is a masonry and wood-frame structure covered with siding. Building 1 is serviced by a forced hot air heating system, with air conditioning provided by individual wall or window air conditioning units. According to the expert, Building 1 was in average condition. In the expert's opinion, based on his discussions with the current property owner, and his review of the Borough's zoning ordinance, Building 1 "no longer contributed to [the] value of the property and should be razed."

Building 2 is a warehouse, constructed in approximately 1950, containing a concrete floor, walls partially comprised of concrete block and corrugated metal panels, a gable-style roof and two overhead 10' x 12' overhead doors. According to the expert, Building 2 has a ceiling height of approximately 14' feet. No heat or air conditioning is furnished to Building 2. Photographs of the exterior of Building 2 depict a warehouse containing a partially flat roof with a roofline that steadily inclines upward at an approximate 30° degree angle resulting in almost doubling of the roof height for portions of Building 2. The interior photographs depict a floor and wall area utilized for storage and an adjacent mezzanine area with built-in wooden racks/shelves. The expert expressed that, in his opinion, Building 2 was in poor condition.

---

[6] During cross-examination the expert expressed some uncertainty as to when he performed his exterior inspection, stating that "I might have been out there in the summer of '16, when I initially went out there."

Building 3 is a part-one and part-two story office facility. The interior of Building 3 is comprised of finished sheetrock walls and ceilings, carpeted and tile flooring, overhead fluorescent lighting, a reception area, a kitchenette, bathrooms, and a storage area. Building 3 is serviced by forced air heating and central air conditioning.[7] The expert expressed that, in his opinion, Building 3 was in fair condition.

Building 4 is a light industrial building with supportive offices. Interior photographs of Building 4 depict a well-illuminated light industrial/manufacturing and warehouse-like space that contains finished sheetrock walls and ceilings in certain areas, partially finished sheetrock walls and ceilings in other areas, and fully exposed ceilings in other areas. Building 4 contains overhead fluorescent lighting, commercial grade shelving, and storage areas for wood beams and products with overhead individual unit heaters. Building 4 contains a mixture of tile flooring and concrete flooring and varying ceiling heights of approximately 8' to 14'. The supportive office areas consists of finished sheetrock walls, acoustical tile ceilings, and overhead fluorescent lighting, bathrooms, a kitchenette, and forced air heating and central air conditioning. Exterior photographs of Building 4 depict several dock height doors. In the expert's opinion, Building 4 was in poor condition.

Building 5 is a warehouse, constructed in approximately 1950, containing a concrete floor, walls comprising corrugated metal panels, a loading dock, a gable roof and an overhead door. Overhead lighting is furnished by a series of what appear to be single-bulb electric fixtures. The warehouse is heated by individual unit heaters. Interior photographs of Building 5

---

[7] According to the expert, some interior renovations were performed to Building 3 by the current property owner in or about 2015.

6

depict exposed steel ceiling joists and roof trusses, commercial grade shelving units, and an area for floor storage.[8]

In or about July 2014, Empire TFI Jersey Holdings LLC entered into a net lease agreement with Direct Millwork LLC for Building 4 and Building 5, comprising approximately 40,925 square feet (the "Lease"). The Lease was for an initial term of ten years, at an average annual rental rate of $1.86 per square foot over the lease term. The Lease also contains an option to extend its term for an additional five years.

## II. Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

---

[8] Exterior photographs depict signage affixed to Building 4 and Building 5 and box trucks and trailers located around the buildings bearing the name Direct Millwork.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the [challenging party] all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the challenging party has overcome the presumption of validity. If the court concludes that a challenging party has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According plaintiffs all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that plaintiffs produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of plaintiffs' expert and the facts upon which the expert relied raise debatable questions regarding the correctness of the subject property's 2013 and 2014 year local property tax assessments.

However, concluding that the presumption of validity has been overcome does not equate to a finding that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of [the challenging party's] case-in-chief, the burden of proof remain[s] on the [challenging party] . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

    b. Highest and Best Use

In the court's pursuit to determine the market value of a property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater Borough, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element of the property valuation process is discerning its highest and best use. Ford Motor Co., 10 N.J. Tax 153, 161; see also General Motors Corp. v. Linden City, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., 10 N.J. Tax at 161.

Highest and best use has been defined as the "reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially

9

feasible, and that results in the highest value." The Dictionary of Real Estate Appraisal, at 93. When undertaking a highest and best use analysis, the appraiser must sequentially consider what uses are: (1) legally permissible; (2) physically possible; (3) financially feasible; and (4) maximally productive. Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015); see also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000). The highest and best use analysis requires an appraiser to "interpret[] the market forces that affect the subject property and identif[y] the use or uses on which the final opinion of value is based." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013). Thus, a property's highest and best use will ultimately be "shaped by the competitive forces within the market where the property is located." Id. at 331. However, an appraiser's highest and best analysis must not focus on the "value-in-use because [that] determination is a function of property use and not a function of a particular owner's use or subjective judgment as to how a property should be used." Clemente, 27 N.J. Tax at 268.

The concluded highest and best use of an improved property should "maximize[] an investment property's value, consistent with the rate of return and associated risk." Ford Motor Co., 127 N.J. at 301. When performing a highest and best use analysis of improved property the appraiser should consider: "[(i)] maintain[ing] the improvements as is; [(ii)] cur[ing] items of deferred maintenance and retain[ing] the improvements; [(iii)] modify[ing] the improvements (e.g. renovate, modernize, or convert), or [(iv)] demolish[ing] the improvements." The Appraisal of Real Estate, at 43. However, "[f]or any of these options to be financially feasible, the change must add at least as much value to the property as it costs. In other words, the value after conversion, renovation, or alteration less the costs of the modification must be greater than or equal to the value of the property as is." Id. at 346-7. For these reasons, The Appraisal of Real

10

Estate cautions that, "demolition of improvements [is] . . . the most extreme form of modification to the current use of the property as improved." Ibid. Thus, before concluding that demolition of an improvement is the most appropriate course of action, an appraiser must gauge whether the property value "as improved is greater than the value of the site as though vacant less demolition costs." Ibid. If the financial feasibility test reveals that the cost for modifying or renovating existing improvements will contribute no less than an equal measure of value to the property, then the improvements need not be demolished. Conversely, if the improvements, as existing, modified, or renovated, will "no longer contribute to value, demolition and redevelopment of the ideal improvement would be economically supportable." Ibid.

Here, the expert concluded that the 'as vacant' highest and best use of the subject property was for commercial development consistent with the I – Industrial zoning district. Recognizing that the subject property was improved with five structures and was being used as a warehouse and light industrial facility with supportive offices, the expert concluded that the highest and best use of the subject property 'as improved,' was "continuation of the remaining existing use" as a warehouse and light industrial facility, and demolition of Building 1.

However, the court finds that the expert's highest and best use analysis of Building 1 was imperfect. The expert's conclusions that use of the subject property as a warehouse and light industrial facility was legally permissible, and construction of improvements for that use was physically possible represents only part of the highest and best use equation. The expert must next examine the financial feasibility of maintaining the property and improvements in its current use and condition, retaining the improvements and curing existing items of deferred maintenance, renovating, modernizing, or converting existing underutilized structures for a use that will be more maximally productive, or demolishing the improvements. This requires the

11

appraiser to perform a comprehensive analysis of the market to ascertain supply and demand of particular uses, and testing the "contributory value of the change with the cost of making the change." The Appraisal of Real Estate, at 347; see also Clemente, 27 N.J. Tax at 269; Six Cherry Hill, Inc. v. Cherry Hill Twp., 7 N.J. Tax 120, 131 (Tax 1984), aff'd, 8 N.J. Tax 334 (App. Div. 1986). A parcel of real property need not have only one highest and best use, "[o]ne parcel of land may serve many functions." Clemente, 27 N.J. Tax at 269. The appraiser's highest and best use conclusion "should specify the optimal use (or uses), when the property will be put to this use or achieve stabilized occupancy, and who would be the most likely purchaser or user of the property." Ibid.

Here, based on discussions that the expert and his staff appraiser had with the current property owner, the expert summarily concluded that Building 1 cannot be used or rented for residential purposes. Specifically, the expert testified that "the purchaser, during our discussion with him regarding the sale, . . . [stated] that he is not allowed to lease the . . . residential units on the subject site." According to the expert, the reason offered by the current property owner for his inability to use Building 1 for residential purposes was that the "facility had been closed for a number of years and those buildings were vacant for a number of years, and because it was a violation of the current zoning . . . he was unable to lease those buildings" for residential purposes.

Effective cross-examination disclosed that the expert did not contact the Borough's zoning office, planning office, or code officials to ascertain whether any such restriction or limitation was in fact imposed by the Borough on the use of Building 1. The expert's conclusion that Building 1 could not be used for residential purposes was based solely on his discussions with the current property owner and his review of the zoning ordinance language. Further cross-

examination revealed that the expert "do[es] not have anything from the town, per se," reflecting that Building 1 could not be leased for residential purposes. Significantly, in retort to questions posed during cross-examination, the expert offered that "I was certain that legally [the current property owner] could not rent them [the Building 1 residential units] . . . and it would have affected our years as well because at that time, they would have the same result, because the building or facility had been abandoned . . . , anyone during our valuation dates would not have been able to lease those residential units either. . . . my analysis was [that] the best idea was to tear it [Building 1] down."[9]

The expert offered scant testimony that he performed any analysis of the market to ascertain the supply and demand of particular uses, or tested Building 1's potential contributory value in contrast with the costs associated with modifying or renovating Building 1. No evidence was adduced during trial regarding the costs to modify, renovate, or convert Building 1, or the costs associated with demolishing Building 1. When performing a highest and best use analysis, "an appraiser should determine whether the applicable codes, ordinances, or private restrictions allow modification of the improvements that would bring them into conformity." The Appraisal of Real Estate, at 347. Here, the expert seemingly gave no consideration to modifying Building 1 to a use that would bring it into conformity with the I – Industrial zoning district. Moreover, in response to the court's inquiry whether the expert examined modifying

---

[9] The expert offered no factual or legal support for his conclusion that the use of Building 1 for residential purposes was "abandoned." Under N.J.S.A. 40:55D-68, an owner's "abandonment" of a nonconforming use may result in a "terminat[ion of] the right to its further use" of the property for the nonconforming use. S & S Auto Sales, Inc. v. Zoning Bd. of Adjustment, 373 N.J. Super. 603, 613-614 (App. Div. 2004). However, whether a use of a property was, or was not, abandoned is based on the subjective intent of the property owner. The burden rests with the property owner to prove that it did not intend to abandon the nonconforming use, which "intent must be continuing and definite." Id. at 624. Although the passage of time may be one factor considered, it is not alone dispositive in determining whether an owner intended to abandon the nonconforming use of a property. Ibid.

Building 1 for legally permissible uses such as office space, the expert simply offered that "given . . . where property was situated, the location, . . . I know the demand for additional office space other than what was already vacant on the site as it were. So I don't know if it would have been financially feasible to renovate [Building 1 to] office space." Thus, admittedly, the expert failed to analyze the financial feasibility of the cost of converting or modifying Building 1 to another use, against the value of the subject property after conversion, renovation, or alteration.

As expressed in The Appraisal of Real Estate, the demolition of existing improvements is ". . . the most extreme form of modification to the current use of the property as improved." Id. at 346. Thus, before an appraiser concludes that the demolition of an improvement is the most productive use of a nonconforming building, an appraiser must analyze the market and the demand for other uses, weighing the costs associated with conversion or modification, and the potential return to the property owner on that investment, against the benefit and costs associated with razing the improvement.

Based primarily on the current property owner's statements, the expert concluded that use of Building 1 for residential purposes was abandoned, thereby prohibiting continuation of the non-conforming use.[10] However, as set forth above, the expert undertook no independent action to verify or corroborate the current property owner's statements or understanding. The expert did not consult with any Borough officials to ascertain whether the current property owner's

---

[10] The expert's appraisal report contained interior photographs of Building 1, taken in October 2017. The photographs depict two vacant residential units without furniture or any personal property. However, interior photographs of the studio unit depict a bathroom with a shaving cream canister, a razor, hairbrush, hand soap, a mirror, body lotion, toothpaste, toothbrush, a shower curtain, a waste basket, toilet paper and a bathroom floor rug. Moreover, photographs of the unit's kitchen depict a coffee maker, toaster, blender, paper towels, cooking utensils, and assorted spices and cooking accoutrements on the counter. Photographs of the living area depict a sofa, a bed, a table, a lamp, hangers, a laundry basket, and miscellaneous clothing strewn about. Thus, the photographs raise material questions whether some portion of Building 1 was being occupied for residential purposes in 2017.

statements were accurate. Additionally, the expert offered no evidence of the source of the current property owner's belief that Building 1 could not be used for residential purposes, or his level of understanding or knowledge about applicable zoning ordinances and restrictions.

In sum, because the expert offered no credible evidence or testimony that the market value of the subject property with Building 1 being razed was equal to or greater than the market value of the subject property with Building 1 being modified or converted, or credible evidence that Building 1 could not be used for residential purposes. Therefore, the court rejects the expert's highest and best use conclusion that Building 1 does not contribute to the value of the subject property.

Given that the expert offered no opinion on the fair market value of Building 1 as of the respective valuation dates, the court must gauge whether sufficient evidence exists in the record from which the court can discern a value for Building 1. In embarking on this analysis, the court is mindful of its obligation to apply its own judgment to the factual information presented and to the "valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall Twp., 99 N.J. 265, 280 (1985).

As stated above, based on the evidence presented, the court is unable to conclude that Building 1 cannot be used for residential or other legally conforming uses and thus, does not contribute to the value of the subject property. However, observing not only the physical and economic composition of the subject property (consisting of a mixture of warehouses and light industrial buildings with supportive office facilities), but also the close proximity that exists between Building 1 and Building 2, approximately 8 to 10 feet in certain areas, the court finds that it is reasonable and likely for a hypothetical buyer to purchase the subject property and use Building 1 for offices supportive to Building 2's use as a warehouse, and not as a multi-family

15

residential dwelling. The court's conclusion is further shaped by the fact that a market exists for warehouse and industrial space with supportive offices in the subject property's environs, as evidenced by Building 3 and Building 4. Building 3 comprises approximately 11,324 square feet of supportive office facilities on the subject property only feet away from warehouse and industrial space. Additionally, Building 4 contains warehouse and industrial areas with dedicated supportive office space. Moreover, the Borough's I – Industrial zoning district permits uses that include business and professional offices, landscape architectural services, building inspection services, geophysical surveying and mapping services, industrial design services, etc. These lawfully permitted uses may include the need for both warehouse and industrial space with supportive offices. Accordingly, for the above stated reasons, the court concludes the highest and best use of Building 1 is as supportive office.

      c. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Borough, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune

Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

Although the expert considered all three valuation methods, he opined that the income capitalization approach was the best method to derive an opinion of market value for the subject property.

### 1.  Income Capitalization Approach

When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property.  Parkway Village Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Fort Lee Borough, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996).  "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value."  The Appraisal of Real Estate, at 439.  As Judge Hopkins succinctly stated, when deriving a value for property employing the income-capitalization approach:

> the gross rental value of the property is estimated.  From the estimated gross rental there is deducted a factor for possible vacancies and collection losses.  This results in effective gross income.  Then all the expenses involved in running the property are subtracted, resulting in net income.  Net income is the money which an investor could expect to receive through an investment in the property.  It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Direct capitalization is a technique frequently employed by this court and valuation experts "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's Net Operating Income into an estimate of value.

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, at 121-22.

2. The expert's analysis

Here, in performing his income capitalization approach, the expert identified five leases. Each lease was viewed as reflective of market rent as of the October 1, 2012 and October 1, 2013 valuation dates. The leases bore commencement dates between October 2011 and November 2013, and ranged in leased area from 2,900 square feet to 10,800 square feet.

The expert then applied adjustments to the reported rental values to account for perceived differences in location (0% to 20%), condition (15% to 20%), office area percentage (2.2%), and expense apportionment (0% to 25%). These resulted in downward net adjustments of 17.8% to 52.8% to the rental values for the five leases. The resulting range, per square foot, of unadjusted rents and adjusted rents for the five leased properties are set forth as follows:

| | |
|---|---|
| Unadjusted rents | $3.35 - $5.50 |
| Adjusted rents | $2.30 - $3.42 |

18

Based on the foregoing, the expert concluded a market rent of $2.50 per square foot for the subject property's leasable areas in "fair" condition, and a market rent of $1.50 per square foot for the subject property's leasable areas in "poor" condition. The expert applied his $2.50 per square foot rental value to the 11,324 square feet of Building 3 he deemed in "fair" condition. He further applied his $1.50 per square foot rental value to the 54,316 square feet of Building 2, Building 4, and Building 5 he deemed in "poor" condition. As stated above, the expert attributed no value to Building 1. Ultimately, the expert concluded a Potential Gross Income ("PGI") for the subject property, as of each valuation date, of $109,784 (54,316 sq. ft. x $1.50 = $81,474 and 11,324 sq. ft. x $2.50 = $28,310; $81,474 + $28,310 = $109,784).

In order to compute his Effective Gross Income ("EGI") for each tax year, the expert applied a vacancy and collection loss factor of 20%, per tax year (20% x $109,784 = $21,957). Thus, the expert concluded an EGI of $87,827, as of each valuation date ($109,784 - $21,957 = $87,827). Next, the expert applied stabilized expenses for management fees (5% of EGI), leasing commissions (5% of EGI), and reserves (2% of EGI), to calculate the Net Operating Income ("NOI"). This resulted in a NOI of $77,288, as of each valuation date.

Next, the expert computed his overall capitalization rates of 8.7%, as of each valuation date. Applying the 8.7% capitalization rate to the NOI resulted in an estimated market value for the subject property of $888,400, as of each valuation date ($77,288/8.7% = $888,368).

Finally, the expert applied a 10% downward "Adjustment for Environmental Concerns" in the sum of $88,800, as of each valuation date. According to the expert, he reviewed a 2013 letter prepared for the tenant, Direct Millwork, LLC, which summarized a 2007 preliminary assessment report, and detailed the results of recent site inspections and soil sampling on the subject property (the "2013 Letter"). According to the expert, the 2013 Letter identified areas of

concern on the property that "hindered interest in the sale of the property." Therefore, the expert opined that an adjustment to the "value as cured is warranted."

3. Discussion

Here, the court finds the expert's comparable leases and his adjustments thereto to be generally reasonable and adequately supported in the record. The expert offered testimony that in performing his adjustments, he first adjusted all modified gross leases to net leases, so that all leases were of a similar type. Next, he ranked the comparable leases based on location and condition. He observed that comparable lease 1 was located in Morris County, and in close proximity to major highways, making its location superior to the other comparable leases. He then compared comparable lease 1 to comparable lease 3, which he considered to be a location similar to the subject property in Warren County. In the expert's opinion, no time adjustment was necessary between these leases as the market was flat between the lease dates, the properties were in similar condition, and possessed similar supportive office areas. Thus, in the expert's opinion, the property location was the most significant disparity between the leases, which he estimated at approximately 20%. The expert then performed a similar analysis with respect to the remaining comparable leases to determine his location adjustments. Additionally, the expert offered testimony that he considered the rental rate and condition of the comparable leases, and consulted the Marshall & Swift Valuation Service's cost tables to determine his condition adjustments. Finally, the expert's office area adjustment was based on his analysis of tenancy spaces comprising warehouses with office areas and office buildings. According to the expert, his analysis disclosed a "factor 0.21 per percentage point of difference." He then applied that factor to the ratio of warehouse to office area in the subject property and adjusted each comparable lease based on their respective ratio.

In sum, the court finds the expert's opined economic or market rent of $2.50 per square foot for "fair" condition warehouse/industrial space with supportive office facilities is generally reasonable. Moreover, the court finds the expert's opined economic or market rent of $1.50 per square foot for "poor" condition warehouse/industrial space with supportive office facilities is generally reasonable.

Additionally, as recited above, the court concluded the highest and best use of Building 1 is as supportive office. However, Building 1 is not presently being utilized as supportive office. Therefore, the court deems Building 1 to be in "poor" condition as supportive office space, and ascribes a market rent to it of $1.50 per square foot.

The expert determined and applied a 20% vacancy and collection loss factor to the subject property as of each valuation date. The expert offered that his vacancy and collection loss rate was influenced by the fact that the "subject property was completely vacant for a number of years prior to the effective valuation dates . . ." However, without an adequate understanding and knowledge of what efforts, if any, were undertaken by the property owner as of each valuation date to market the subject property for lease, the mere fact that the subject property may have sat vacant should not define the vacancy and collection loss factor to be applied.

The court's review of the investor survey statistical data annexed to the expert's report disclosed vacancy and collection loss factors in the Third Quarter 2012, between 0.5% to 10%, and in the Third Quarter 2013, between 0.5% to 7%. Thus, based on the court's review of the statistical data and the testimony presented, the court finds that a 15% vacancy and collection loss data is more credible and is supported by the investor surveys.

21

For the tax years involved herein, the expert applied the following stabilized expenses: (i) management fees of 5% of EGI; (ii) leasing commissions of 5% of EGI; and (iii) reserves for replacements of 2% of EGI. The court finds the expert's applied stabilized expenses for management fees, leasing commissions, and reserves to be reasonable.

In deriving his overall capitalization rates, the expert consulted investor surveys and employed the Band of Investment technique. The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)). When employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs., 99 N.J. 265, 279-80 (1985)).

The investor surveys are completed by market participants engaged in real estate financing transactions during given time periods. The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc.

In arriving at his capitalization rates, the expert consulted the American Council of Life Insurers ("ACLI") Investment Bulletins – Commercial Mortgage Commitments – Fixed Rate Mortgages - industrial properties, for the Third Quarter 2012 and Third Quarter 2013. In addition, the expert consulted Korpacz/PWC National Warehouse Market surveys for the Third Quarter 2012 and Third Quarter 2013.

"[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

The court's review and analysis of sub-categories of the ACLI surveys disclosed that, as of the October 1, 2012 valuation date, the reported interest rates were: (i) 4.12%, for industrial properties with fixed rate loans; (ii) 4.68%, for industrial properties having a value less than $2 million dollars; (iii) 3.66%, for New Jersey industrial properties; (iv) 4.68%, for industrial properties having leasable areas between 50,000 to 100,000 square feet; and (v) 4.14%, for industrial properties having a market rent below $50 psf. Thus, based on a review of the survey information, the court concludes that under the Band of Investment technique, a mortgage interest rate of 4.25% is more reasonable, and supported by the survey data. In addition, the court's review of the identical sub-categories revealed loan-to-value ratios of: (i) 64%; (ii) 62.9%; (iii) 57%; (iv) 63.7%; and (v) 63.9%. Thus, the court concludes that the expert's proffered loan-to-value ratio of 60% is reasonable. Moreover, the survey sub-categories revealed amortization periods of: (i) 22 years; (ii) 19 years; (iii) 23 years; (iv) 19 years; and (v) 23 years. Thus, the court finds the expert's proposed amortization period of 20 years is reasonable. Finally, the ACLI survey sub-categories revealed extracted equity rates of: (i) 7.04%; (ii) 10.13%; (iii) 6.11%; (iv) 9.11%; and (v) 7.14%. Given the condition of both the subject property

and the improvements erected thereon, the court concludes that an equity rate of 8.75% is more reasonable, and is supported by the investor survey data.

Therefore, utilizing the Band of Investment technique and the ACLI survey data, the court computes a capitalization rate of 7.96%, as of the October 1, 2012 valuation date (7.431%[11] x 60% = 4.46%; 8.75% x 40% = 3.5%; 4.46% + 3.5% = 7.96%). Thus, the court concludes that an 8% overall capitalization rate should apply to the subject property as of the October 1, 2012 valuation date.

The court's review and analysis of sub-categories of the ACLI surveys disclosed that, as of the October 1, 2013 valuation date, the reported interest rates were: (i) 3.97%, for industrial properties with fixed rate loans; (ii) 4.76%, for industrial properties having a value less than $2 million; (iii) 4.12%, for New Jersey industrial properties; (iv) 4.46%, for industrial properties having leasable areas between 50,000 to 100,000 square feet; and (v) 3.83%, for industrial properties having a market rent below $50 psf. Thus, based on a review of the survey information, the court concludes that under the Band of Investment technique, a mortgage interest rate of 4.25% is more reasonable, and supported by the survey data. In addition, the court's review of the identical sub-categories revealed loan-to-value ratios of: (i) 65.7%; (ii) 62%; (iii) 62.2%; (iv) 64.5%; and (v) 66.3%. Thus, the court concludes that the expert's proffered loan-to-value ratio of 60% is reasonable. Moreover, the survey sub-categories revealed amortization periods of: (i) 23 years; (ii) 20 years; (iii) 23 years; (iv) 23 years; and (v) 24 years. Thus, the court finds the expert's proposed amortization period of 20 years to be reasonable. Finally, the ACLI survey sub-categories revealed extracted equity rates of: (i) 8.42%; (ii) 9.03%; (iii) 5.03%; (iv) 8.78%; and (v) 8.62%. Given the condition of both the subject property and the

---

[11] Mortgage constant for an interest rate of 4.25% and a 20 year loan amortization term.

24

improvements erected thereon, the court concludes that an equity rate of 8.75% is more reasonable, and is supported by the investor surveys.

Therefore, utilizing the Band of Investment technique and the above survey data, the court computes a capitalization rate of 7.96%, as of the October 1, 2013 valuation date (7.431%[12] x 60% = 4.46%; 8.75% x 40% = 3.5%; 4.46% + 3.5% = 7.96%). Thus, the court concludes that an 8% overall capitalization rate should apply to the subject property as of the October 1, 2013 valuation date.

Finally, the court rejects the expert's downward "Adjustment for Environmental Concerns" of $88,800, as of each valuation date. A "government-approved cleanup plan is not a necessary predicate for an adjustment to assessed value for environmental contamination." Orient Way Corp. v. Lyndhurst Twp., 27 N.J. Tax 361, 374 (Tax 2013), aff'd, 28 N.J. Tax 272 (App. Div. 2014). Nonetheless, credible evidence of the cost to cure environmentally contaminated property must be presented, thereby enabling the court to determine its true market value for local property tax purposes. Inmar Associates, Inc. v. Carlstadt Borough, 112 N.J. 593, 605-08 (1988).

Here, the expert offered no tangible evidence that any environmental condition on the subject property negatively impacted its value or hindered interest in the subject property. Moreover, the expert submitted no estimates, proposals, or site remediation plans detailing the estimated costs for curing any areas of environmental concern on the subject property. The court's own review of the 2013 Letter revealed that "[t]he results of all soil samples collected were below the NJDEP Residential and Non-Residential Soil Remediation Standards (SRS)." Additionally, the 2013 Letter continues, that "[a]lthough petroleum staining was noted in a few

---

[12] Mortgage constant for an interest rate of 4.25% and a 20 year loan amortization term.

borings . . . concentrations were below NJDEP SRS. The potential exits for petroleum impacted soils to be located [on the subject property]; however remedial measures are not required for the soils encountered during this investigation." Thus, because the expert presented no credible evidence that the subject property was environmentally contaminated, or the estimated costs associated with curing alleged environmental contamination, the court rejects the expert's 10% downward adjustment for "environmental concerns."

For the reasons set forth above, the court finds the true value of the subject property under the income-capitalization approach to be $1,067,150, as of the October 1, 2012 and October 1, 2013 valuation dates.

**2013 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Building 3 | $2.50 (Net) @ 11,324 sq. ft. | | $ 28,310 |
| Buildings 1, 2, 4 & 5 | $1.50 (Net) @ 57,216 sq. ft. | | $ 85,824 |
| TOTAL:POTENTIAL GROSS INCOME | | | $ 114,134 |
| LESS: Vacancy & Collection Loss | @ 15% | | ($ 17,120) |
| TOTAL: EFFECTIVE GROSS INCOME | | | $ 97,014 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of EGI | $4,851 | |
| Leasing Commissions | @ 5% of EGI | $4,851 | |
| Replacement Reserves | @ 2% of EGI | $1,940 | |
| TOTAL: EXPENSES | | | ($ 11,642) |

| | |
|---|---|
| NET OPERATING INCOME | $ 85,372 |

| | |
|---|---|
| CAPITALIZATION RATE | 8.0% |

| | |
|---|---|
| INDICATED VALUE | $1,067,150 |

**2014 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Building 3 | $2.50 (Net) @ 11,324 sq. ft. | | $ 28,310 |
| Buildings 1, 2, 4 & 5 | $1.50 (Net) @ 57,216 sq. ft. | | $ 85,824 |
| TOTAL:POTENTIAL GROSS INCOME | | | $ 114,134 |
| LESS: Vacancy & Collection Loss | @ 15% | | ($ 17,120) |
| TOTAL: EFFECTIVE GROSS INCOME | | | $ 97,014 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of EGI | $4,851 | |
| Leasing Commissions | @ 5% of EGI | $4,851 | |
| Replacement Reserves | @ 2% of EGI | $1,940 | |
| TOTAL: EXPENSES | | | ($ 11,642) |

NET OPERATING INCOME                                    $ 85,372

CAPITALIZATION RATE          8.0%

INDICATED VALUE                                              $1,067,150

Having reached a conclusion of the true market value of the subject property, the court will determine the correct assessment for the 2013 and 2014 tax years. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

True market value        x        Average ratio  =        Revised taxable value

For the 2013 tax year, application of the Chapter 123 ratio results in an applied upper limit of 0.9021 and lower limit of 0.6667. The ratio of total assessed value, $1,658,000, to true market value, $1,067,150, yields a ratio of 1.5537%, which exceeds the applied upper limit. Consequently, the calculation for the 2013 tax year is:

27

$1,067,150     x     0.7844 =     $837,100 [ROUNDED]

Accordingly, a judgment establishing the subject property's tax assessment for the 2013 tax year will be entered as follows:

Land:         $296,200
Improvement: $540,900
Total:        $837,100

For the 2014 tax year, application of the Chapter 123 ratio results in an applied upper limit of 0.9298 and lower limit of 0.6872. The ratio of total assessed value, $1,658,000, to true market value, $1,067,150, yields a ratio of 1.5537%, which exceeds the applied upper limit. Consequently, the calculation for the 2014 tax year is:

$1,067,150     x     0.8085 =     $862,800 [ROUNDED]

Accordingly, a judgment establishing the subject property's tax assessment for the 2014 tax year will be entered as follows:

Land:         $296,200
Improvement: $566,600
Total:        $862,800

The court will enter judgments reflecting the foregoing.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.