RIMM, J.T.C.
These local property tax assessment matters involve a claim that the existing use of the subject properties as a high-rise apartment complex which is subject to rent control is not the highest and best use for the land. Taxpayers contend that *123 office use is the highest and best use. The subject properties are two contiguous lots each with a twelve-story apartment building together known as the Cherry Hill apartments. The “East Building,” known as 2151 Route 38, is owned by Six Cherry Hill, Inc., and is designated as Block 285, Lot 2B. For the tax year 1982 the assessment was:
Land $ 648,000
Improvements 1,852,000
Total $ 2,500,000.
On appeal to the Camden County Board of Taxation by the taxpayer, the assessment was sustained. Taxpayer then filed a complaint in the Tax Court pursuant to N.J.S.A. 54:2-39[1] seeking a reduction in the assessment. For the tax year 1983 the original assessment for this property was:
Land $ 648,000
Improvements 1,846,900
Total $ 2,494,900.[2]
Taxpayer filed a direct appeal with the Tax Court pursuant to N.J.S.A. 54:3-21 seeking a reduction in this assessment as well.
The “West Building” is owned by plaintiff, Eleven Cherry Hill, Inc. It is designated as Block 285, Lot 2C and is known as 2141 Route 38. For the tax year 1982 the assessment was:
Land $ 648,000
Improvements 1,852,000
Total $ 2,500,000.
On appeal to the Camden County Board of Taxation by the taxpayer, the assessment was sustained and the taxpayer then filed a complaint in the Tax Court for a reduction in the assessment. The assessment for the tax year 1983 was the same as that for 1982. The taxpayer filed a direct appeal with *124 the Tax Court seeking a reduction in this assessment. Although the two buildings are in separate corporate ownership, the corporations are owned by the same principal and the buildings are operated together. All four matters were accordingly consolidated for trial.
The two contiguous lots are irregularly shaped. Lot 2B has a total area of 6.081 acres with 706.43 feet of frontage along Route 38. Lot 2C consists of 6.139 acres but has a smaller frontage of 606 feet along Route 38. The buildings are approximately 28-years old. They are of concrete and steel construction. The exterior walls are brick and the interior walls are painted plaster throughout, with ceramic tile wainscotting in the bathrooms. The roofs are of flat concrete fabrication with four-ply asphalt composition covering. The floors are concrete with carpeting. There are 214 apartments in the east building. Two commercial units, a delicatessen and a nursery, are located in the basement. The basement of the east building also contains coin-operated laundry facilities, a trash compactor room, a paint room, rooms for supplies and mechanical equipment and a heating and control room. There are 213 apartments in the west building. One commercial unit, used by a beautician, is in the basement. There are also laundry facilities and other support facilities in the basement of this building. Each building is served by two passenger elevators and a freight elevator. Central trash chutes to the interior compactor in the basement are located on each floor of each building. Units on the third through twelfth floors of the buildings have concrete balconies. The apartments in each building are of various sizes ranging from small one-bedroom, one-bath apartments to three-bedroom, two-bath apartments. Additional improvements include a one-story garage structure attached to each building and each with a capacity of 58 automobiles, a concrete pool and pool house which serves the entire complex, a small playground and blacktop-paved parking and driveway areas. The properties are in close proximity to the Cherry Hill Mall, a super-regional shopping complex, motels and hotels, including the Cherry Hill Inn, several office buildings and *125 several restaurants. A major one-family residential housing development known as Cherry Hill Estates is situated to the rear of the apartment complex, and there are several mid-rise apartment buildings within one-half mile of the subject properties.
Plaintiffs’ appraisal, admitted in evidence, indicates “areas of deferred maintenance” which include constant mechanical problems with an old elevator system which has inadequate controls that require frequent replacement. There are numerous defective heating and air conditioning units and areas of falling or patched plaster and peeling paint. Kitchens are outdated and the heating and domestic hot-water systems are inefficient, with leaking heat valves a problem. Some of the apartments had no floor covering, no heating units, no refrigerators, no ovens or no ranges. Some units had no kitchens except for a “small bit of cabinetry,” and some units had no toilets.
There was testimony that there were approximately 80 vacancies in the two buildings at the time of the appraiser’s inspections which occurred on various dates between August 25, 1983 and October 24, 1983, and that two-thirds of the 80 vacant units needed “rather complete rehabilitation.”[3] In addition, extensive portions of the blacktop have been patched or repaved.
The subject properties are located in the township’s R-4 high-rise apartment zone according to the current zoning map and ordinance. The same zoning requirements were in effect on both assessing dates. The zone permits high-rise residential structures provided that the minimum lot area is four acres and the maximum density is 20 dwelling units an acre. The two subject buildings are nonconforming as there are a total of 183 *126 more dwelling units than the maximum permissible density for the two sites under the existing zoning ordinance.[4]
 Plaintiffs have the “burden of ultimate pursuasion” in seeking reductions of the judgments of the Camden County Board of Taxation and of the original assessments. Passaic City v. Botany Mills, Inc., 72 N.J.Super. 449, 454, 178 A.2d 657 (App.Div.1962). In attempting to meet such a burden, plaintiffs are faced with the presumption of correctness in favor of the board’s judgments, Riverview Gardens, Section 1, Inc. v. North Arlington Bor., 9 N.J. 167, 174, 87 A.2d 425 (1952), and the original assessments, Passaic City v. Botany Mills, Inc., 72 N.J.Super. at 454, 178 A.2d 657. Before this court will reject either of the board’s judgments or either of the original assessments, plaintiffs must introduce evidence which is sufficiently “definite, positive and certain in quality and quantity” to prove a valuation different from the board’s judgments for the tax year 1982 or the original assessments for the tax year 1983. Aetna Life Insurance Co. v. Newark City, 10 N.J. 99, 105, 89 A.2d 385 (1952).
Taxpayers’ appraiser “partially developed” the income approach to value but relied on the market data approach as the value indicator for the subject property as vacant land. This was based on his opinion that the highest and best use of the two lots is not for high-rise apartment buildings but is for office use. Plaintiffs’ gross income estimates for the existing use, in the partially developed income approach, were based on rents determined by comparison with other high-rise apartment complexes in Cherry Hill. After determining the income, the appraiser determined expenses by reviewing statements for the years 1979, 1980, 1981 and 1982. The following statements summarize the partial income approach used by plaintiffs:
*127 East Building
1982 1983
(as of 10/1/81) (as of 10/1/82)
Potential Gross Rentals $ 823,200 908,200
Less Vacancy and Collection Loss (8%) (65,900) (72,700)
Other Income 30,000 31,500
Effective Gross Income (EGI) $ 787,300 $ 867,000
Expenses:
Operating Expenses[5] $ 533,400 581,100
Advertising 14,600 15.500
Professional Fees 20,000 21,000
Management (7Va% of EGI) 59.000 65.000
Insurance 18.000 18.500
Miscellaneous 10,000 10.000
Reserve for Replacements 95,000 95,000
Total Expenses 806,100
Net Operating Income $ 60,900
West Building
1982 1983
(as of 10/1/81) (as of 10/1/82)
Potential Gross Rentals Í 825,600 910,000
Loss Vacancy and Collection Loss (8%) (66,000) (72,900)
Other Income 24,000 25,000
Effective Gross Income (EGI) $ 783,600 $ 862,900
Expenses:
Operating Expenses Í 566,100 605,300
Advertising 14,600 15.500
Professional Fees 20,000 21,000
Management (Tk7« of EGI) 58,800 64,700
Insurance 18,000 18.500
Miscellaneous 10,000 10,000
Reserve for Replacements 95,000 95,000
Total Expenses 782,500 830,000
Net Operating Income $ 1,100 $ 32,900
The resulting net operating incomes were so low that, according to the appraiser, there was “not even enough remaining income to pay real estate taxes” and capitalization was therefore meaningless. The income approach to value was carried no further than determining the net operating income for each year for each building. The witness then stated that this *128 approach shows that the highest and best use of the subject properties is no longer high-rise apartment use since the properties had no value in their present use. His appraisal states that “the subject site has been valued as if vacant and available for its highest and best use which is estimated to be speculatively for commercial/office use.” Using the market data approach, the witness concluded, based on five land sales, that the value of each of the two lots was $650,000 less $150,000, as the estimated demolition and removal costs for each building, or $500,000 as of each of the two assessing dates, October 1, 1981 and October 1, 1982.
A fundamental appraisal principle is that a property must be . valued at its highest, best and most profitable use. Inmar Associates, Inc. v. Edison Tp., 2 N.J.Tax 59, 64-65 (Tax Ct.1980); American Institute of Real Estate Appraisers, The Appraisal of Real Estate 28 (8 ed. 1983) (hereinafter cited as The Appraisal of Real Estate). Property is examined for all possible uses and that use which will yield the highest return should be selected. However, the principle of highest and best use requires that the achievement of the use selected must be probable. The contemplated use cannot be remote, speculative or conjectural. Inmar Associates, Inc. v. Edison Tp., supra at 65; The Appraisal of Real Estate, supra at 249-250. The law of this State is abundantly clear on the point. “Underlying the settled rule that remote uses are irrelevant (citations omitted) is the more basic principle that property valuation should have some relationship to realty ____” Hackensack Water Co. v. Old Tappan Bor., 77 N.J. 208, 214, 390 A.2d 122 (1978). The literature on proper appraising practices is equally clear on the point.
The a priori elements necessary to justify an estimate of highest and best use are provided in the following definition: ‘... that use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in highest land value.’ [Ordway and Harris, “The Dynamic Nature of Highest and Best Use,” Appraisal J., July 1981 at 325 (quoting Boyce, Beal Estate Appraisal Terminology (1975) at 107); emphasis supplied]
See also The Appraisal of Real Estate, supra at 243-267. The definition of highest and best use “states [that] the use must be *129 reasonably probable____ [I]t must be legal or, if it is not permitted, must be within reasonable probability of being permitted.” Scribner, “Highest and Best Use or Most Probable Use,” Real Estate Appraiser, May-June 1978 at 26; emphasis supplied.
Clearly the use of the subject lots for office purposes was not legal on either of the two assessing dates. There was no dispute between the parties that the properties were zoned for high-rise apartment buildings on those dates. Office use was not permitted. In this case, then, plaintiffs’ conclusion as to highest and best use failed to consider that the use was not legally permissible on the assessing dates. West Orange City v. Goldman’s Estate, 2 N.J.Tax 582 (Tax Ct.1981).
Plaintiffs were not, however, precluded from showing the probability of a change in the applicable zoning ordinance to allow the suggested highest and best use of the property.
If the highest present utilization of the site or property is not allowed under the current zoning, due to shifting economic and social patterns, and if there is a reasonable probability that a change in zoning is obtainable, these conditions can be considered in the highest and best use determination. However, the appraiser is obligated to disclose fully all pertinent factors relating thereto, including the time and expenses involved in the change, and the risk that the zoning change may not be granted. [The Appraisal of Real Estate, supra at 251; emphasis supplied]
There is no evidence before the court that office use was within a “reasonable probability of being permitted.” There is no evidence of a reasonable probability of either a change in the zoning ordinance or of the granting of a zoning variance permitting office use, the use on the basis of which the property was valued by plaintiffs’ expert. “Zoning amendments are not routinely made or granted.” State v. Gorga, 26 N.J. 113, 117, 138 A.2d 833 (1958); cf. Inwood at Great Notch v. Little Falls Tp., 6 N.J.Tax 316 (Tax Ct.1984) (vacancy decontrol, although adopted after the critical assessing date, was reasonably foreseeable on the assessing date); L & Z Realty Co., Inc. v. Ringwood, 6 N.J.Tax 450 (Tax Ct.1984) (taxpayer’s land was ineligible for farmland assessment as the anticipated use of the land for commercial logging violated local zoning requirements, *130 and taxpayer had failed to adduce any proof as to when the prohibition might be lifted). Plaintiffs’ evidence only deals with reasons for rejecting current use. There is extensive testimony describing the subject buildings as characterized by economic obsolescence due primarily to rent control; detailing the physical and functional inadequacies of the buildings, particularly problems of substantial deferred maintenance; and elaborating on the fact that the high expenses to be incurred in the operation of high-rise multifamily buildings make it unlikely that such buildings would be built in Cherry Hill. None of this evidence deals with the issue of the reasonable likelihood that office construction would be permitted in the zone in which the subject properties are located. When questioned specifically concerning his opinion on the speculative commercial use of the land, the appraiser only said
Well, the property currently is zoned for high-rise apartments. It is my opinion that the use of the land is most suited for commercial usage. All the land surrounding the property is currently being utilized as commercial usage. To use the land on a commercial basis would require a zoning change. And I therefore felt that it would be speculative to assume—but most probable to, to utilize the property on a commercial basis, [emphasis supplied]
There are additional factors that have a bearing upon the legal use of property. “Private restriction[s], ... building codes, historic district controls, and environmental regulations are considered because they may preclude many possible highest and best uses.” The Appraisal of Real Estate, supra at 250-251. Plaintiffs’ appraiser testified that there is a restrictive covenant which limits the use of the subject lots to highrise apartments. However, plaintiffs did not produce any evidence that the restriction is unenforceable. Plaintiffs have thus failed to show that commercial use of the properties is within a “reasonable probability of being permitted.” Scribner, supra.
“Implied in [the definitions of highest and best use] is that the determination of highest and best use takes into account the contribution of a specific use to the community and community development goals as well as the benefits of that use to individual property owners.” The Appraisal of Real *131 Estate, supra at 244. Thus appraisers should specifically recognize the place of community development goals in the determination of highest and best use. See Scribner, supra at 23-24. Such evidence as there is before the court, on this basis also, indicates that the use of the subject lots for office purposes is very improbable of achievement. The subject properties contain a total of 427 residential units in a rent-controlled municipality. There is no evidence that a developer of the lots for office use would or could provide housing in accordance with the doctrine of zoning announced by our Supreme Court in Southern Burlington County N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151, 336 A.2d 713 (1975), app. dism. 423 U.S. 808, 96 S. Ct. 18, 46 L.Ed.2d 28 (1975) (Mt. Laurel I). The holding of Mt. Laurel I makes very improbable a zoning change permitting the devotion of the land to commercial use and resulting in the demolition of two large rent-controlled apartment buildings. The difficulty in obtaining a zoning change or a variance is further emphasized by Southern Burlington County N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158, 456 A.2d 390 (1983) (Mt. Laurel II) in which the court said that the Mount Laurel doctrine “is a corollary of the constitutional obligation to zone only in furtherance of the general welfare. The doctrine provides a method of satisfying that obligation when the zoning in question affects housing.” Id., at 209, 456 A.2d 390.
Even assuming that office use were a legal or reasonably probable alternative use, plaintiffs have failed completely to deal with the question of the financial feasibility of the use they claim is the highest and best use. Clearly that question must be dealt with. The Appraisal of Real Estate, supra at 244. “The proper determination of highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses.” Barrett, “A *132 Restatement of Highest and Best Use,” Real Estate Appraiser and Analyst, November-December 1979 at 8.[6]
Furthermore, plaintiffs’ appraiser has failed to determine the physical possibility of the recommended alternative use of the properties, this being another of the “a priori elements necessary to justify an estimate of highest and best use.” Ordway and Harris, supra. Specifically,
[s]ize, shape, area and terrain affect the uses to which land may be developed [sic]. The utility of a parcel may depend on its frontage and depth. Irregularly shaped parcels may cost more to develop and, when developed, may have less utility than a regularly shaped parcel of the same area. [The Appraisal of Real Estate, supra at 250]
A proper determination of highest and best use' cannot be made without consideration of these physical factors, and there has been no such consideration in this case.
Finally, in arriving at his conclusion of the highest and best use of the subject properties, plaintiffs’ appraiser overlooks the fact that, when dealing with improved property, “three use potentials exist: (1) the present improvements are demolished and the land is used for another purposes; (2) the present improvements are retained without substantial physical or operational change; and (3) the present improvements are retained but with significant change in the physical property or its management.” Derbes, “Highest and Best Use-What Is It?, “Appraisal J., April 1981 at 175. Plaintiffs should have determined value in accordance with these principles of highest and best use of improved property for the properties in their existing use beyond the partial income approach presented to the court. The existing use of improved property will continue “until land value in its highest and best use exceeds the total value of the property in its existing use.” Scribner, supra at 23.
Plaintiffs contend that, because of the substantial deferred maintenance, rent control and the enormous expenses required to operate the buildings, it is not economically feasible to *133 operate the existing structures. However, plaintiffs have failed to present any evidence to the court of the value of the buildings if substantially rehabilitated with the cost of rehabilitation to be deducted from such value in arriving at the fair market value of the properties on each of the two assessing dates. Appraisers often find that expenditures are necessary to bring properties to a competitive level, and they therefore allow for these costs of rehabilitating the properties. The Appraisal of Real Estate, supra at 591.
While good management is presumed, G & S Co. v. Eatontown Bor., 2 N.J.Tax 94, 98 (Tax Ct.1980), aff'd 6 N.J.Tax 218 (App.Div.1982), the high vacancy rate, the substantial deferred maintenance and the high ratios of expenses to income all rebut this presumption. There also was evidence that substantial amounts of money were spent on advertising in an effort to rent the apartments, but two-thirds of the vacant apartments “needed rather complete rehabilitation.” The appearance of the buildings was also described by the appraiser as “average to poor.” It is not logical for plaintiffs to spend large amounts of money on advertising while the vacant apartments are essentially uninhabitable and the buildings themselves are unattractive to prospective tenants. Thus plaintiffs have not dealt with the possibility of retaining the present improvements with significant changes in the physical properties or their management.
Plaintiffs have failed to overcome the presumption of correctness in favor of the county board judgments and the original assessments. However, defendant’s assessor’s testimony was presented during the trial and must be considered. The assessor testified that, in accordance with a written appraisal prepared by him and admitted,in evidence, each property had a fair market value of $3,350,000 as of October 1, 1981 for the tax year 1982. The assessor’s testimony was essentially an oral repetition of the written appraisal. Even if the assessor’s *134 opinion of value is accepted in its entirety for the tax year 1982, the municipality is not entitled to an increase in the assessments for that year. The chapter 123 ratio[7] for Cherry Hill Township for the tax year 1982 was 69%. The lower limit of the common level range was 58% and the upper limit of the common level rangé was 80%.[8] Since the ratio of the assessment for each property for the tax year 1982 to the value claimed by the township is within the limits of the common level range, the assessments are not to be disturbed.[9] Beyond that conclusion, testimony adduced on behalf of the municipality is, in this case, of no help to the taxpayers. Among other things, the assessor’s opinion of the capitalization rate to be used in his income approach was essentially unsupported by any facts on which this court may rely in concluding what the capitalization rate is. Schmertz v. Dover Tp., 4 N.J.Tax 145, 152 (Tax Ct.1982). The court is mandated to weigh the evidence and find a valuation different from the assessments under appeal only if the evidence supports such a finding. Samuel Hird and Sons, Inc. v. Garfield City, 87 N.J.Super. 65, 75, 208 A.2d 153 (App.Div.1965).
The municipality’s appraisal also specifically indicates that it was prepared as of October 1, 1981 for the tax year 1982. There was no independent determination of value for the tax year 1983. Accordingly, there is no evidence before the court for the tax year 1983 on the basis of which value can be determined.
The Clerk of the Tax Court is directed to enter judgments dismissing all four complaints.

 N.J.S.A. 54:2-39 was repealed by N.J.S.A. 54:51A-21, £.1983, c. 45 and replaced by NJ.S.A. 54:51A-la effective January 28, 1983.

 The complaint recites that the total assessment is $2,496,000. The amount of taxes indicates that $2,494,900 is the correct assessment.

 Eighty vacancies constitutes a vacancy factor of 19% of the total of 427 apartments. The appraiser testified that the actual vacancy was greater than the vacancy and collection loss factor of 8% which he used in his partial income approach.

 Based on a total of 12.2 acres.

 The term “operating expenses” as here used by the court is for ease of presentation and to consolidate certain expenses detailed by the appraiser, including telephone, fuel, electricity, management, payroll and similar items.

 The article indicates that this analysis is not made when "zoning laws preclude any alternative uses."

 Chapter 123 refers collectively to N.J.S.A. 54:l-35a, -35b and 54:51A-6 (formerly N.J.S.A. 54:2-40.4).

 State of New Jersey, Department of the Treasury, Division of Taxation, Certification of Average Ratios and Common Level Range For Use In The Tax Year 1984 at 5.

 For each building: $2,500,000/$3,350,000 = 75%.