NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3963-18

CIBA SPECIALTY
CHEMICALS, CORP.,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

TOWNSHIP OF DOVER,

      Defendant-Appellant/
      Cross-Respondent.

_____

CIBA SPECIALTY
CHEMICALS, CORP.,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

TOWNSHIP OF TOMS RIVER,

      Defendant-Appellant/
      Cross-Respondent.

_____

BASF CORP.,

Plaintiff-Respondent/
Cross-Appellant,

v.

TOWNSHIP OF TOMS RIVER,

Defendant-Appellant/
Cross-Respondent.

_____

Argued December 2, 2020 – Decided February 24, 2021

Before Judges Fuentes, Whipple and Firko.

On appeal from the Tax Court of New Jersey, Docket Nos. 5635-2004, 1986-2005, 1501-2006, 3458-2007, 5340-2008, 5210-2009, 4487-2010, 4486-2010, 2155-2011, 2037-2012, 6367-2013, 3624-2014, 1913-2015, 3054-2016, 3686-2017, 1627-2018 and 1066-2019.

John F. Casey argued the cause for appellant/cross-respondent (Chiesa Shahinian & Giantomasi, PC, attorneys; John F. Casey, on the briefs).

Philip J. Giannuario argued the cause for respondent/cross-appellant (Garippa, Lotz & Giannuario, PC, attorneys; Philip J. Giannuario, Brian A. Fowler, and Adam R. Jones, of counsel and on the briefs).

PER CURIAM

Defendant The Township of Toms River, formerly known as Dover Township (the Township), appeals from the judgment of the Tax Court finding

that a tract of land consisting of 1211 acres "was development-prohibited" during tax years 2004 through 2018, due to its designation by the Environmental Protection Agency (EPA) as a Superfund site and subsequent listing in the National Priorities List (NPL). In its cross-appeal, plaintiff CIBA Specialty Chemicals Corporation (CIBA) also contends the Tax Court erred by failing to determine the number of developable acres on the property. We affirm.

I.

We briefly describe the relevant proofs presented during the four phases of the trial. CIBA conducted chemical manufacturing operations on the subject property consisting of 1211 acres in the Township for many years. In addition to abutting a river, the property contained 32.6 acres of freshwater wetlands and State open waters, 6.4 acres of wetlands buffers, and 43.7 acres of intermittent stream corridors as well as flood hazard areas.

The Toms River Chemical Company developed 320 acres of the property for the manufacture of dyes, pigments, resins, and additives, and conducted related operations, such as waste management and disposal. Manufacturing began in 1952 and was "scaled back" in the early 1980's, when the company was acquired by CIBA. On April 24, 1989, the EPA issued its Record of Decision

(ROD)[1] for Operable Unit 1 (OU1), which included the sealing of contaminated wells, installation of a groundwater extraction and treatment system, and discharge of the treated groundwater. The groundwater extraction and treatment system commenced in March 1996 and was to continue until "restoration standards" were met. Manufacturing operations also ceased in 1996.

On September 29, 2000, the EPA issued the ROD for Operable Unit 2 (OU2), which was the remediation of "source areas" of the site's contamination. The two landfills would remain and be subject to DEP regulation. Those operations contaminated the soil and groundwater leading to the EPA designating the property as a Superfund site of approximately 1350 acres. While the EPA had primary oversight and responsibility for approving the environmental remediation work, the New Jersey Department of Environmental Protection (DEP) retained jurisdiction to enforce applicable state standards and regulations. Notably, the property was subject to the Coastal Area Facility Review Act, N.J.S.A. 13:19-1 to -21 (CAFRA), and the DEP designated the property as being within the CAFRA Mainland Coastal Center, Coastal Suburban Planning Area, and Coastal Environmentally Sensitive Planning Area. On September 4, 2001, CIBA and the EPA entered into a consent decree to settle

---

[1] The ROD was not provided in the record.

the EPA's action concerning the ROD for OU2. The second decree complemented the consent decree relative to OU1, which remained independently enforceable on its own terms.

The OU2 consent decree defined the Site as including the entire property and addressed where hazardous substances "have migrated or are migrating, and all suitable areas for implementation of the response action" described in the ROD for OU2. CIBA was to record the consent decree as a notice to any successor in title to the property and record an environmental protection easement in favor of the EPA over the entire property.

Commencing in tax year 2004, after the end of CIBA's manufacturing and the start of environmental remediation, the Township began assessing the property according to residential usage, not yet authorized by the zoning ordinance, that the Township believed the realty market would anticipate with the property. CIBA and its successor, BASF Corporation (BASF), brought appeals for tax years 2004 through 2018 to challenge the assessments.

Because of the complex issues involved, the Tax Court tried the matter in four phases: phase one addressed the propriety of assessing the property based on prospective uses not yet permitted; phase two would address "usable acreage and the development potential of the subject property" with the judge to "render

5

a decision quantifying the number of usable acres that can be readily developed at the subject property during each tax year under protest; phase three was limited to the valuation of the property for tax years 2004 through and including 2011; and phase four would address valuation for tax years 2012 through 2018. The parties entered into a stipulation of value and requested a final judgment, which the judge utilized in entering orders as to all the pending matters.

The assessed value of the property was $20,629,300 for 2004 through 2008. It increased to approximately $80,000,000 for 2009 and 2010 and decreased to $58,715,200 for 2011. In 2012, the property further decreased to $42,715,200; $42,367,500 for 2013; and $42,000,000 for 2014 through 2019.

Phase One Reports and Expert Reports

In March 2006, John Lynch, the Township's Planner, issued an investigative report on whether the property could be declared an area in need of redevelopment under the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -49 (the LRHL). Lynch concluded that the location and layout of the remaining industrial structures, the Superfund designation, and the remediation and monitoring facilities "seriously constrain the development of the remainder" of the property. He recommended redevelopment under the LRHL in order to comprehensively address the property in contrast to

6

"conventional zoning measures," which could lead to "piecemeal development applications" that were less likely to result in the best use of the property.

Lynch considered redevelopment of the entire property as one parcel because the limited access made it "imperative" to address all access and infrastructure issues concurrently. Including the portions that were not amendable to development, due to wetlands and flood-hazard areas, would "allow for more comprehensive planning." Redevelopment plans contemplated large-scale commercial uses, and the residential use of up to 600 age-restricted housing units along a golf course on the site.

On March 15, 2006, the Township noticed a public hearing on whether to pursue redevelopment of the property. In response, CIBA filed a lawsuit to challenge the Township's designation of the property as being in need of redevelopment. The matter was settled by "withdrawal" of the designation without prejudice.

CIBA engaged the realty firm of Cushman & Wakefield to issue a Request for Proposals and Concept Plans (the RFP).[2] Proposals were submitted in response to the RFP to construct residential units, townhomes, age-restricted housing, one million square feet of retail use, 50,000 feet of office space,

---

[2] The RFP was not provided in the record.

7

walking paths, and a golf course with a country club. A "sports resort" with a hotel and recreational activities was among other responses to the RFP.

In July 2008, the EPA issued its Second Five-Year Report[3] on the Site and found the OU1 and OU2 remediation activities were proceeding as anticipated. Of the three options the EPA could select to characterize the Site's status on the NPL, the EPA chose "Final" rather than "Deleted" or "Other." The report noted the volume of contaminated soil had been reappraised from 240,000 to 250,000 cubic yards.

On April 3, 2009, EcolSciences, Inc. issued a report to CIBA on its study of threatened and endangered species on the property. It found three species of non-woody flowering plants that were State-listed as being of special concern but not as endangered, and three wildlife species and potential habitat for those and other species. The Northern pine snake was resident on the property.

In May 2011, Lynch reported to the Township that the environmental remediation activities for the property's surface soils and its "upper aquifer" had been proceeding in excess of twenty years. The "soil cleanup [was] near or at completion," while "the pump and treat of the upper aquifer should continue for

---

[3] There is no First Five-Year Report in the record, which would have been issued in 2003.

A-3963-18

about another [twenty-five] years."  Lynch concluded that only 750 acres could be developed due to the remediation activity, the wetlands and wetland transition areas, habitat areas for the "threatened and endangered species" on the site, and the CAFRA requirements for preserving tree cover.  In 2009, BASF, a multinational chemical company, acquired CIBA.

On July 12, 2012, BASF made a presentation to the EPA of its Conceptual Property Management Plan.  BASF proposed to "delist" or delete from the NPL areas in the western, northern, and southern portions of the property that were labeled in schematics as having an "unrestricted" potential future use.  On January 23, 2013, BASF presented that proposal again at the EPA's Third Five-Year Review meeting.  Notably, the areas that BASF proposed for deletion corresponded to the area designated as unrestricted in the schematic set forth in the ROD for OU2.  On December 6, 2013, the judge granted the Township's motion to bifurcate the trial.

On June 19, 2015, Maser Consultants P.A. (Maser) issued an Addendum to its January 24, 2014 report.  It described developments on other properties, comparable in scale to its development proposals for the subject property, that proceeded with DEP approval of the mitigation measures to preserve critical wildlife habitat for the Northern pine snake and other species.

A-3963-18

On August 12, 2016, Advanced Geoservices prepared an OU2 remedial action report for BASF. It related that the subdivision of the property paralleled the EPA's designation of certain portions by potential future use. BASF represented that Lot 6.01 "meets the requirements for unrestricted use," and that Lot 6.02 met the requirements for "Restricted Commercial/Industrial/Recreational Use," while Lot 6.03 had no designated uses because it included a waste management area. "Institutional controls" in the form of deed notices on Lots 6.02 and 6.03 would preserve the restrictions.

One Advanced Geoservices engineer certified that the OU2 remediation had been "completed[4] in full satisfaction of the requirements of" its ROD while another engineer certified that the OU1 remediation had likewise been completed in full satisfaction of its ROD. On August 22, 2016, the EPA issued an approval letter that stated the EPA's "concurrence on the completion of the OU2 remedial action." On August 26, 2016, the judge granted CIBA's motion for a hearing "on the isolated issue" of whether a zoning change to permit

---

[4] "Completed" meant only "that remedial construction activities have been completed," in the EPA's phrasing. Two trial witnesses testified, on their own personal knowledge and without challenge, that the groundwater remediation activity on the property was ongoing.

A-3963-18

residential development on the property was "reasonably probable" during "the time periods relevant to the instant appeal," or phase one of the trial.

On March 15, 2017, Integra Realty Resources (IRR) issued its report for BASF as to the reasonable probability of "a potential" zoning change or variance from October 1, 2003, to October 1, 2010, that would be sufficiently publicized to affect the realty marketplace's perceptions of the property and its future value. IRR explained that Township officials made statements during its study period that remediation had to precede development, and IRR did not see anything during that period in the municipal master plans, the planning reports, zoning change, or in defendant's manner of explaining redevelopment that would have led a reasonable buyer to conclude that the Township "intended to permit residential uses of the property."

In April 2017, environmental consulting firm Paulus, Sokolowski and Sartour, LLC (PS&S) prepared an addendum to its October 2012 report for BASF. PS&S performed a planning and engineering analysis of whether there was a reasonable probability that redevelopment of the property would include "high-density residential uses," and concluded it was "not reasonably probable" because "it would not have been feasible" to develop the property. PS&S's planning analysis cited the property's contamination, the public concern about

the contamination, and the property's notoriety as reasons why a variance for residential uses would not likely be granted.

Phase One Testimony

Brian Kirkpatrick of PS&S testified on behalf of CIBA and was qualified as an expert witness in the area of land-use planning. He explained that PS&S reviewed the zoning ordinance and use and dimensional limitations; the applicable DEP and EPA regulations; deed restrictions; wildlife community sentiment; and market interest. As of 2010, Kirkpatrick stated site work was still progressing on groundwater remediation, soil treatment and disposal, and closing and capping one of the landfills. In addition, the property was still an active Superfund site, which in PS&S's view, carried a strong stigma with both developers and the public against residential use. Kirkpatrick opined there was no likelihood of a zoning change during the relevant period.

Brian McPeak of PS&S also testified as a planner for CIBA and focused on CAFRA issues. McPeak opined that a 2006 zoning change in the Township included a reexamination of the master plan, but that the process did not result in any change allowing for residential uses on the property. Therefore, McPeak stated a zoning change to that effect was unlikely. Indeed, the zoning ordinance was ultimately amended to remove high-density housing, and the master plan

12

identified other areas as suitable for "additional housing." McPeak also opined that the ongoing remediation had a "huge" and "profound" effect on the property's potential for development. He explained that the CAFRA limit on impervious coverage for property in a "suburban planning area" was thirty percent but could rise to eighty percent if CAFRA so designated an area as a "center" where regional development could be channeled. In its twelve-year planning process, McPeak noted that the Township "never once indicates" a belief "that housing is an appropriate reuse for this site."

Anthony Graziano testified on behalf of BASF as an expert in real estate valuation. He explained that the Township's 2006 zoning amendment added commercial uses along the property's Route 37 frontage without adding residential uses, consistent with the master plan. Graziano referenced transcripts in which municipal officials plainly did not think that political and public sentiment would allow residential use of the property before Cell 1 was removed, even if the EPA and DEP allowed it. He also concluded that the market would "absolutely not" have perceived a zoning change to permit high-density residential development on the property to be "reasonably probable."

Jeromie Lange of Maser testified for the Township as an expert in land use. He acknowledged that residential use required a zoning change, a use

13

variance, or adoption of a redevelopment plan. In Lange's view, the Township was most likely to proceed by redevelopment because it would bring additional benefits, such as a reduction in county and school taxes, and the ability to issue project bonds. Lange observed by 2000, the RODs "had already spelled out all of the remediation" that the property required. He also believed that Cell 1 was not "an absolute prohibition" to residential development that "absolutely had to be removed for residential development to happen."

And, Lange affirmed his earlier opinion that the Township would not have accepted a redevelopment plan until there was at least an agreement to remove Cell 1, even though the EPA did not require removal. He believed that the "tremendous public pressure" to have Cell 1 removed from the property would have been a strong incentive for the Township to work with a developer to reach an agreement that would accelerate its removal. Full development of the property, including construction and marketing, would probably take twenty to twenty-five years in Lange's estimation.

On November 17, 2017, at the end of phase one of the trial, the judge issued an opinion and found that there was no prospect of a zoning change for residential use of the property. A memorializing order was entered that day.

Phase Two Expert Reports

On June 26, 2018, Herpetological Associates, Inc. (HA), issued a report of Robert Zappalorti and David Schneider to BASF on the "rare wildlife" on the property and how it may constrain development under DEP and CAFRA regulations. HA noted similarities of its conclusions to those contained in the 2009 EcolSciences report, stating it was consistent with DEP and New Jersey Pinelands Commission standards. Likewise, HA agreed with PS&S's conclusion that the property had approximately 1067 acres of critical wildlife habitat for the Northern pine snake. However, HA disagreed with the conclusions in the Maser reports that the Northern pine snake population was geographically isolated on the property and that the DEP demonstrated a lack of concern about the species and its habitat by failing to list the property in the Landscape Project maps.

On October 9, 2018, Byron DuBois, the principal biologist of DuBois Environmental Consultants, issued a report commissioned by Maser on behalf of the Township about the Northern pine snake habitat on the property and the implications for its development potential. DuBois opined that this snake population was genetically isolated due to the lack of corridors by which snakes could traverse the heavy development abutting the property's boundaries. He

15

further opined that the potential snake habitat on the property's western portion was not critical because it did not have features to support hibernation or nesting. DuBois "propose[d]" that approximately 386[5] acres of the property be "considered critical habitat with appropriate buffers" because that was "sizeable enough to support the seasonal activity parameters of the northern pine snake including foraging and migration." He took issue with PS&S's opinion that 55.4 or 89.1 acres would be developable and would accordingly not be the DEP's "preferred option."

Phase Two Testimony

Michael Kovacs of EcolSciences testified for CIBA as an expert on threatened and endangered species, their habitat, and the impact on a property's development potential under CAFRA. EcolSciences's report found no threatened species, but it did find the endangered Northern pine snake. Kovacs explained that CAFRA regulations prohibited development of areas that were documented as threatened and endangered species habitat, or where development would have direct or secondary adverse impacts. He noted there

---

[5] DuBois testified that 386 was the intended figure and that the report mistakenly stated it was 880.

were no regulatory changes since 2009 that would have altered the property's development potential.

Kirkpatrick again testified on behalf of CIBA, this time on land-use permitted under CAFRA and in wildlife biology. He testified that the DEP would allow development in an area of concern if the applicant demonstrated that there was a public interest in the project, there was no alternative to it, and a mitigation plan would offset the adverse impact on the natural resources being disturbed to a degree resulting in a net gain.

Further, Kirkpatrick declared that the presence of a threatened species on a site has the same effect on its development potential under CAFRA as the presence of an endangered species. According to Kirkpatrick, 1066.8 acres were classified as both "critical wildlife habitat" and as threatened and endangered species habitat under CAFRA. Considering potentially different scenarios, the property's development potential were 89.1 acres or 179 acres.

Zappalorti testified for CIBA as an expert in herpetology, threatened and endangered reptile species, and their habitats. In his experience, Zappalorti testified that a viable population of Northern pine snakes needed 1000 acres of habitat. He opined that development of 400 or 500 acres would degrade the habitat range and lead to a population decline.

17

Lange also testified again on behalf of the Township as an expert in land-use planning, civil engineering, and development entitlement. He testified that the DEP was not intransigent and would listen to an applicant's ideas for meeting its requirements. Lange explained that parts of the property in the schematic in the ROD for OU2 as having development potential were made "only with regard to brownfield or toxic contamination" and to "what the EPA believes could happen on the site in the future relative to contamination." The designations carried no pretense of addressing other development constraints like threatened or endangered species habitat. Lange criticized Maser's conclusion that 475 acres were suitable for development and commented Maser "had to make something up frankly" and "just made assumptions." According to Lange, Maser chose "a portion of the property [t]hat seemed as good a place as any to draw the lines," and created a "shape" that would "kind of fit."

Raymond Walker, an ecology expert, testified for the Township on CAFRA regulations and environmental biology. He explained that Lange asked him to review "reports prepared by other consultants" about the property's development potential under CAFRA. Relying on the PS&S and EcolSciences reports, Walker concluded that the snake habitat was "restricted to the eastern portions of the property" and disagreed with Kirkpatrick that the entire property

18

was critical wildlife habitat. Walker opined that CAFRA was intended "to balance the environmental concerns in the coastal zone with the development pressures" located there and to focus development in centers in order to spare other areas. In that light, he viewed the DEP's 2017 decision to include the property in a coastal development center and sewer service zone "that would "eliminate [its] wetlands at some point" as strong indicators that the DEP doesn't consider this property to be critical habitat." He also surmised the DEP would consider the figure of 55.4 developable acres low and not deem the site critical "for the survival of" the Northern pine snake "in the [S]tate."

Steve Havlik was employed by BASF and previously by CIBA in maintenance, facilities, operational planning, and management. As head of the environmental remediation group, he testified that the goal of the subdivision was to segregate Lot 6.01 and its lower level of environmental risks so that it could be deleted from the NPL. Havlik claimed there was no indication of leakage from Cell 1, and Cell 2 had "regulatory issues that required them to remediate" by removing all drums for off-site disposal. Cell 3 held 110,000 cubic yards of sludge from the wastewater treatment plant.

DuBois testified on behalf of the Township as an expert in herpetology, wildlife ecology, and CAFRA regulations compliance. He opined that the entire

property was "suitable" as Northern pine snake habitat and that 375 developable acres would result from "horse trading" with the DEP.

Robert Zelley, the senior principal at Maser and a State-licensed site remediation professional, testified for the Township as an expert in brownfields and "remediation and cleanup" under State and federal law. As remediation progressed, Zelley declared that the Superfund site area was the only section that continued to need remediation. The unrestricted portion was "clean" and "viable for development." Zelley conjectured that the EPA does not "amend the paperwork to eliminate[,] adjust, edit, modify to remove the area that . . . has been identified as clean." In his opinion, transforming the uncontaminated and unrestricted area into a new lot by way of a subdivision would lead to a new deed without any restrictions being issued.

The judge also heard rebuttal testimony from CIBA's experts. In her opinion for phase two, the judge found that development on any portion of the subject property was prohibited "due to its designation as a Superfund site and the accompanying institutional controls[6] in place" that "made development during the 2004 through 2018 tax years impermissible," notwithstanding the

---

[6] These "institutional controls" were not identified but presumably include consent orders and decrees that are not included in either party's appendix.

"future anticipated unrestricted development potential for 790 acres, and restricted, limited, or prohibited development potential for the remaining 421 acres." While the presence of threatened and endangered species and habitat for them "will undoubtedly trigger extensive CAFRA regulatory review" to ensure "mitigation or accommodation," neither the EPA nor the DEP would "prohibit" development of "any portion" of the 790 acres.

For the remaining 421 acres, which were "specific and well-delineated," the "environmental conditions and institutional controls such as deed restrictions" would "limit or prohibit any future development . . . ." Accordingly, the judge found that "once development approval is received from [the] [EPA] and [DEP] or the property is delisted," it was unlikely that CAFRA regulations pertaining to threatened and endangered species and their habitat "would prohibit development of . . . Lot 6.01 within the current industrial zoning."

Further, the judge noted that the entire property was placed on the NPL due to soil and groundwater contamination, that remediation was ongoing, and was "anticipated to continue for decades." The judge explained that until the EPA and DEP expressly grant approval for public use, then "access to the property is prohibited to the public, and development would be prohibited as

21

well."   No portion of the property had been delisted; therefore, the judge highlighted "development on the [s]ite was prohibited."

The judge noted that the taxpayer had the burden of proving, by a preponderance of the evidence, that the potentially developable acreage was as low as CIBA asserted and commented this "[t]axpayer doesn't reference" the Northern pine snake or any other such "species and habitat except in the context of these tax appeals."  Neither party proffered a witness from the EPA or DEP, and the judge deemed it would be "speculation on the court's part" if she were "to determine developable acreage that would be permitted by the [DEP] without any testimony from" that agency.  The difference of opinion among the experts left the judge unconvinced "that [the] [DEP] would prohibit development of the 790 unrestricted acres, as opposed to requiring some mitigation or adaption." This appeal and cross-appeal followed.

On appeal, the Township contends the judge erred by: (1) finding that the property could not be developed for procedural reasons; (2) excluding certain documents as privileged mediation communications; (3) addressing the likelihood of a zoning change in isolation from the other elements of valuation; and (4) failing to determine the number of developable acres on the property.  In its cross-appeal, CIBA raises similar points.

22

II.

Our review of a Tax Court decision is limited.  Estate of Taylor v. Dir., Div. of Tax'n, 422 N.J. Super. 336, 341 (App. Div. 2011).  The Tax Court's factual findings "will not be disturbed unless they are plainly arbitrary or there is a lack of substantial evidence to support them."  Yilmaz, Inc. v. Dir., Div. Tax'n, 390 N.J. Super. 435, 443 (App. Div. 2007) (quoting Alpine Country Club v. Borough of Demarest, 354 N.J. Super. 387, 390 (App. Div. 2002)).  In our review, "we take into account the special expertise of Tax Court judges in matters of taxation," Dover-Chester Assocs. v. Randolph Twp., 419 N.J. Super. 184, 195 (App. Div. 2011), and a tax judge's "findings will not be disturbed unless they are plainly arbitrary or there is a lack of substantial evidence to support them." Jablin v. Borough of Northvale, 13 N.J. Tax 103, 107 (App. Div. 1991).

Thus, we examine "whether the . . . findings of fact are supported by substantial credible evidence allowing due regard to the Tax Court's expertise and its ability to assess credibility." Id. at 108.  However, our review of the Tax Court's legal conclusions is de novo.  Advance Hous., Inc. v. Twp. of Teaneck, 215 N.J. 549, 566 (2013).  "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special

deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

### III.

We first turn to the Township's contention that the Tax Court judge erred by finding that the property could not be developed for procedural and other reasons. Section 300.425 of the C.F.R. provides the criteria for placing sites on the NPL, as well as for deleting them from it. 40 C.F.R. § 300.425(d) and (e). A site or a portion of it "may be deleted from or recategorized on the NPL where no further response is appropriate." 40 C.F.R. § 300.425(e). The EPA must obtain the concurrence of the state where the site is located. 40 C.F.R. § 300.425(e)(2). The deletion must be based on a finding that "all appropriate response actions required" to address the toxic release and its adverse consequences have been "implemented," 40 C.F.R. § 300.425 (e)(1)(i), or that a "remedial investigation has shown that the release poses no significant threat to public health or the environment." 40 C.F.R. § 300.425 (e)(1)(iii).

In addition, the EPA must "ensure public involvement during the proposal to delete" a site or a portion of it from the NPL. 40 C.F.R. § 300.425 (e)(4)(i) to (iii). The EPA must publish notice locally and in the Federal Register, solicit public comments, and "[r]espond to each significant comment and any

significant new data submitted during the comment period."  40 C.F.R. § 300.425 (e)(4)(iv).  Those criteria, along with the standards for applying them and the necessary documentation, were elaborated in the EPA's "Close Out Procedures for [NPL] Sites" and "Procedures for Partial Deletions at NPL Sites."

The Township's objection to the sufficiency of the evidence supporting the judge's decision is based on its perception of the inadequacies in its evidential support, which was based largely on expert testimony.  We see no basis for disturbing the judge's conclusion that no portion of the property could have been developed during the tax years at issue.

The weight assignable to any expert opinion is a question for the finder of fact.  LaBracio Fam. P'ship v. 1239 Roosevelt Ave., 340 N.J. Super. 155, 165 (App. Div. 2001).  Expert opinion can be assigned the weight that the fact-finder deems appropriate in light of the facts and reasoning upon which the opinion is predicated.  See State v. Jenewicz, 193 N.J. 440, 456 (2008).  In considering whether a judge of the Tax Court has erroneously found adequate factual support to accept an expert's opinion, we must recognize that Tax Court judges have "special qualification[s], knowledge and experience."  Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 311 (1992) (alteration in original) (quoting Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 280 (1985)).  Out of deference to that

expertise, we reject the judge's factual findings only when they are "plainly arbitrary." Lenal Props., Inc. v. Jersey City, 18 N.J. Tax 658, 660 (App. Div. 2000).

A judge must articulate reasons for choosing between contradictory expert opinions. See State v. M.J.K., 369 N.J. Super. 532, 549-52 (App. Div. 2004). Here, the regulations on delisting a portion of the Superfund site declared that the EPA had to ensure the satisfaction of the ROD's for OU1 and OU2, confirm the compliance of any other "institutional controls," consult with the DEP, and solicit and respond to public comments. The property's known environmental contamination, the visceral concerns of the public and several municipal officials, the presence of Cell 1 in particular, and the conflicting expert testimony on whether the uncontaminated portion of the property was still needed to support the ongoing remediation of other areas was substantial evidence that partial delisting of the uncontaminated portion was not available for the asking.

In the matter under review, the judge explained why she was skeptical of Zelley's testimony that a partial delisting was readily available and characterizing same as a "net opinion." Zelley provided no support for opining that the partial delisting of an uncontaminated portion of a Superfund site was

26

available upon a simple request. Expert opinion "is entitled to no greater weight than the facts and reasoning upon which it is based." Todd v. Sheridan, 268 N.J. Super. 387, 401 (App. Div. 1993) (citing Johnson v. Salem Corp., 97 N.J. 78, 91 (1984)).

Moreover, experts must base their opinions on "factual evidence," Buckelew v. Grossbard, 87 N.J. 512, 524 (1981), which may be "facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial." Greenberg v. Pryszlak, 426 N.J. Super. 591, 607 (App. Div. 2012) (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)). Experts may rely on their "knowledge, skill, experience, training, or education," Rule 702, but they may not give a "net opinion," unsupported by any factual evidence or data. Creanga v. Jardal, 185 N.J. 345, 360 (2004); Buckelew, 87 N.J. at 524.

The record supports the judge's determination that Zelley merely based his opinion on an inference from the generalized declaration of an EPA policy to return property to productive use when safe and feasible. Zelley did not cite an EPA regulation or policy statement on sua sponte partial listings or to communications in this case, or other cases, in which the EPA encouraged the owner of a Superfund site to seek a partial delisting.

27

Furthermore, the judge was correct in her analysis. Zelley did not allow for the possibility that an uncontaminated portion could still remain needed for access to the contaminated areas, transport of contaminants from the contaminated areas, transporting dangerous decontaminating agents to them, or other support work to which the public could not safely be exposed. He did not discuss the property in any detail in that regard, and the record was far short of presenting enough evidence to compel a finding that the 790 unrestricted acres had become unnecessary at any particular time to support remedial work in other areas of the property.

Moreover, Havlik rebutted Zelley's opinion by explaining why the EPA would not view subdivision of the uncontaminated portion of the property, a unilateral act by its owner, as proving the satisfaction of any ROD requirement. Havlik also explained that the EPA and the DEP would condition a partial delisting on the owner's submission of deed notices that the RODs and other control documents named. Zelley had unconvincingly declared deed notices to be unnecessary, on the basis that an area within the boundaries of a Superfund site but designated as having "unrestricted" development potential could not logically be viewed as part of the Superfund "project," and therefore did not

28

need deed restrictions regardless of what a consent decree or other control documents mandated.

The judge found the DEP would eventually allow development of the 790 unrestricted acres under suitable conditions, that the DEP would not have made any determinations based on the trial record alone and would not provisionally allow development activity in advance of those decisions. Saliently, the DEP's determination as to how much property could be developed under CAFRA required more than simply calculating what percentage of impervious coverage to allow. For example, the DEP would have required proof of the extent of the Northern pine snake habitat on the property, the extent to which development would disturb or diminish its ecological value, and the degree to which on-site and off-site mitigation might offset the habitat disturbance. The judge did not abuse her discretion in rejecting Zelley's opinion as deficient.

We conclude the judge gave a thorough explanation of her reasons and how she weighed the evidence as a fact-finder. There was substantial evidence to support the judge's finding that the Township failed to show development activity would have been allowed on any portion of the subject property during the tax years at issue.

29

IV.

We next address the Township's argument that the judge erred by finding the Cushman & Wakefield RFP, along with responses from developers, were shielded from discovery under the mediation communication statutory privilege. The Township acknowledges that the developers may have expected CIBA not to disclose its responses to competitors in the event development actually proceeded, but the developers did not anticipate the use of their proposals at a mediation.

The Uniform Mediation Act, N.J.S.A. 2A:23C-1 to -13, defines a "mediation communication" as "a statement, whether verbal or nonverbal or in a record, that occurs during a mediation or is made for purposes of considering, conducting, participating in, initiating, continuing, or reconvening a mediation or retaining a mediator." N.J.S.A. 2A:23C-2. It recognizes that a mediation may have a "nonparty participant," and it distinguishes a mediation from a "proceeding," which includes "a judicial . . . process" as well as "related . . . discovery . . . ." Ibid.

The Act provides that mediation communications "are confidential to the extent agreed by the parties" unless they are made during a mediation session that "is open, or is required by law to be open, to the public . . . ." N.J.S.A

A-3963-18

2A:23C-8.  See also N.J.S.A. 2A:23C-3(a).  It preserves the confidentiality by conferring a privilege that makes them "not . . . subject to discovery or admission in evidence in a proceeding[.]"  N.J.S.A. 2A:23C-4(a). To that end, "[i]n a proceeding, . . . a mediation party may refuse to disclose, and may prevent any other person from disclosing, a mediation communication."  N.J.S.A. 2A:23C-4(b)(1).

The privilege may be waived "if it is expressly waived by all parties to the mediation."  N.J.S.A. 2A:23C-5(a); see also N.J.S.A. 2A:23C-4(a).  The privilege does not apply to statements that are not mediation communications, so "[e]vidence or information that is otherwise admissible or subject to discovery shall not become inadmissible or protected from discovery solely by reason of its disclosure or use in a mediation."  N.J.S.A. 2A:23C-4(c).

Here, the pre-trial judge during phase one of the trial issued an opinion denying the Township's motion for discovery of the responses to the RFP.  The judge found the documents were subject to the statutory privilege for mediation communications, finding CIBA's "failure to object when [the Township] included some of the RFP responses as exhibits to pretrial motions in these matters" did not amount to a "knowing and express waiver" of the privilege. Unlike the "express waiver" by the plaintiff in Willingboro Mall, Ltd. v. 240/242

31                                                           A-3963-18

Franklin Avenue, L.L.C., 215 N.J. 242, 261 (2013), here, the privilege protected the RFP, the responses, "and any related communications."

The Township's argument about the expectations of the developers who responded to the solicitation is unavailing. Saliently, it ignores their assent to a confidentiality agreement and fails to explain how the developers who participated in executive sessions were uninformed about the mediation or any secrecy surrounding the proceeding. Therefore, we discern no abuse of discretion in the judge's decision to exclude the RFP and responses thereto under the mediation privilege.

V.

Next, we address the issue of whether the judge erred by addressing the likelihood of a zoning change to allow residential uses on the property as an isolated question. The Township contends that unlike the objective question of the number of developable acres, which must be answered before any appraisal can begin, the expectations about the potential of a zoning change constitute subjective opinions of market actions that an appraiser can take into account simply by observing their statements and conduct without having to opine as to whether their opinions are reasonable.

We note that, procedurally, after the judge granted the Township's motion for bifurcation, the first phase of the trial was to address "the development potential of the subject property." The judge also granted CIBA's motion for a hearing "on the isolated issue of whether or not it was reasonably probable that a change in zoning permitting residential redevelopment of the subject property would have been approved during the time periods relevant to the instant appeal." The Township was directed to "advance value arguments" as of each annual valuation date "predicated upon alternate use scenarios," to support the proposition "that 'as of' those dates, market participants would have expected that a zoning change would be 'reasonably probable' to occur" in respect of facilitating redevelopment of the site for residential use. This was to be presented in accordance with the plans and densities set forth in Maser's "expert planning report" of January 2014.

At the end of phase one, the judge issued an opinion on whether the property could be valued as having any development potential for residential use. The judge explained that the Township had the burden of proof because it was "the party challenging the existing zoning" with the argument "that there would, in fact, be a zoning change," and added that "[s]omething had to go first" at trial, and that he chose the issue of "whether there was a reasonable

probability of a zoning change at the property during the years in question," because [the Township] sought to value the property as if its prospective development, viewed as of the valuation dates for each of those tax years, had been "reasonably likely" to include "at least some residential development" as the "highest and best use."

In addition, the judge noted that the entirety of the property was within the Superfund site, and that some of it was not contaminated, in particular "a large portion to the west" near Route 37. Another portion of the property contained Cell 1, which was an on-site toxic-materials landfill that had been "approved" by "the environmental authorities" and sealed.

Moreover, the judge aptly explained the property was to be assessed according to the "highest and best use" that was "legally permissible." The use had to be legally permissible as of the valuation date, and the case law treated a use as legally permissible if it was likely to become permissible soon enough for its prospect to increase market perceptions of the property's profit potential. As a threshold test for reaching the question of how the market would perceive the property's value, the party advocating valuation under the new use had to show, as of the valuation date, that a zoning change to permit it had a "reasonable probability" of being adopted.

34

The judge cited several factors supported by case law about finding whether a zoning change had a reasonable probability of enactment. The most notable factors were: (1) the nature of market interest in the property; (2) the complexity and likelihood of success in securing approval from the municipality for a zoning change; and (3) the complexity and likelihood of securing approval from the regulatory agencies with authority over the property, without which any zoning change would be moot. Securing any of those approvals could face "hurdles and hazards along the way."

Furthermore, the judge highlighted that the record did not contain a "financial analysis to show market interest in the property" as of the valuation dates for a "redevelopment of this property as residential development." And that the absence of market interest in a particular kind of development on a parcel would leave the owner with no incentive to seek a zoning change to allow it. Further, this would leave the municipality with no impetus to adopt a redevelopment plan that requires one.

In the judge's view, the listing of the property as a Superfund site due to substantial contamination, in particular of the groundwater, gave it "a level of notoriety" that suggested the Township might have accepted some residential development as an inducement for a developer to assume the cost of more

35

remediation than the EPA required, namely, the removal of Cell 1. The lawsuits to compel the removal of Cell 1 and legal claims by adjacent property owners and the DEP for natural resource damage were further evidence of the governmental and public interest in its removal. However, the Township's abandonment of redevelopment proceedings and its failure to adopt a redevelopment plan proved that the Township never intended to offer the prospect of residential development as an inducement for developers to incur the cost of removing Cell 1. The testimony of the Township's experts that it had such an intent was accordingly speculative and amounted to the absence of evidence of a "reasonable probability that the zoning at the property would change."

The judge further found that even if the Township had been willing, securing regulatory approval for residential development on the property would have been a "very high" hurdle in light of the "serious pollution," the public awareness of it, and the complexity of the remediation and of the applicable regulatory regimes. There was no demonstrated "reasonably probable" prospect on the valuation dates in this case that the DEP and the EPA would allow the disturbance of what the record depicted as "a successful landfill," or allow the risk of transporting "the 35,000 drums" of toxic materials "and whatever else

36

that's in there" in order to find a new location at which to duplicate the work of its safe disposal. "If there's enough incentive anything could be accomplished," but "securing necessary approvals . . . certainly wasn't going to be done any time near the valuation dates."

We are convinced that because of those obstacles, which reflected "the serious Superfund cleanup underway," the judge providently concluded that "[n]o market participant in my view would have looked at this property" on any of the valuation dates for tax years 2004 through 2011 "and say that these approvals are going to be secured relatively soon, soon enough for me to pay a price for this property that reflects residential development. It just wasn't happening." All of those "hurdles and hazards along the way" would defeat a zoning change to permit residential development of the property. The unlikelihood of obtaining the regulatory approvals concerning pollution and moving Cell 1 made it unnecessary to estimate the degree of difficulty to obtain the additional CAFRA approvals that would be needed if development were to proceed.

In sum, the judge concluded that "no market participant in my view would have looked at this property on" any of the valuation dates through October 1, 2010," and "sa[id] that these approvals are going to be secured relatively soon,

37

soon enough for me to pay a price for this property that reflects residential development. It just wasn't happening." Consequently, the Township's failure to meet its burden of proving that residential uses were legally permissible required the judge to value the property "under the zoning in place on the valuation dates." "It would be inequitable to tax this property at a value that reflects residential development when there is really no serious indication at the times that are relevant here that this property would be re-zoned to allow residential development." The owner was "sitting on a parcel . . . that was contaminated, that had many concerns, that was generating public opposition, and which was zoned not for residential development. It is fair to tax them to reflect that reality," not on circumstances that might arrive "[i]f some day the property is cleaned up."

The burden of showing that the highest and best use of a property is something "other than its current use" is on "the person claiming otherwise," and the showing must be "by a fair preponderance of the evidence." Clemente v. Twp. of South Hackensack, 27 N.J. Tax 255, 267 (Tax 2013), aff'd o.b., 28 N.J. Tax 337 (App. Div. 2015). That party here was the Township.

Property must be valued according to its highest and best use. Ford Motor Co., 127 N.J. at 300-01. Highest and best use is a concept rooted in the market's

perceptions of realty value, because the question it answers is "[w]hat use would the market make of that property?" Id. at 302 (citation omitted). The answer "requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses." Clemente, 27 N.J. Tax at 269. The inquiry must be "based upon what was known and reasonably anticipated as of the assessment date and not upon speculation or conjecture." Linwood Props., Inc. v. Borough of Fort Lee, 7 N.J. Tax 320, 328 (Tax 1985).

Nonetheless, the posited highest and best use must have "a probability of achievement" and "cannot be remote, speculative or conjectural." Ford Motor Co., 127 N.J. at 301 (citation omitted). The four criteria are that the use must be "1) legally permitted, 2) physically possible, 3) economically feasible, and 4) the most profitable." Ford Motor Co. v. Twp. of Edison, 10 N.J. Tax 153, 161 (Tax 1988) (citing Am Inst. of Real Estate Appraisers, The Appraisal of Real Estate at 274 (9th ed. 1987)), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992).

If the highest and best use is not currently permitted, it "must be within reasonable probability of being permitted." Six Cherry Hill, Inc. v. Cherry Hill Twp., 7 N.J. Tax 120, 129 (Tax 1984) (citation omitted), aff'd o.b., 8 N.J. Tax 334 (App. Div. 1986). Valuing a property according to a use that would require

a zoning change requires "a probability of a zoning change in the near future." Romulus Dev. Corp v. Town of West New York, 7 N.J. Tax 305, 318 (Tax 1985), aff'd o.b., 9 N.J. Tax 90 (App. Div. 1987). A zoning change is not probable in the near future if municipal approval of it, along with approval for the new use from environmental agencies or other "regulatory bodies" with jurisdiction over the property, "would require a substantial period of time, with hurdles and hazards along the way that might defeat such a zoning change." Ibid.

In the analogous context of condemnation, our Supreme Court has similarly allowed evidence about the effect on market value of a likely zoning change. "It is generally agreed that if as of the date of taking there is a reasonable probability of a change in the zoning ordinance in the near future, the influence of that circumstance upon the market value as of that date may be shown." State ex rel. Highway Comm'r v. Gorga, 26 N.J. 113, 116 (1958); accord State ex rel. Comm'r of Transp. v. Caoili, 135 N.J. 252, 264-65 (1994) (clarifying that the standard was "reasonably probable," not "probable").

However, the Court emphasized that the question of whether the zoning change was reasonably probable as of the taking date was a question of whether the evidence was admissible. "Whether there is evidence of such probability to warrant submitting the issue to the jury, is in the first instance a question for the

court as in the case of any other issue of fact." Gorga, 26 N.J. at 117. Our Supreme Court later affirmed that Gorga "addressed the standard for judging the sufficiency of evidence of potential zoning changes affecting the future use of condemned property," as a threshold to be cleared before evaluating how the evidence might have affected market perceptions of value. Caoili, 135 N.J. at 261-62. Under this "clear two-step process," the court performs a "gatekeeping function by screening out potentially unreliable evidence" of a zoning change to prevent it from figuring in the determination of market perceptions of value. Borough of Saddle River v. 66 East Allendale, LLC, 216 N.J. 115, 138 (2013) (quoting Caoili, 135 N.J. at 264).

Here, the judge performed the threshold determination required. In a thorough analysis, the judge explored whether a zoning change to permit residential uses on the property was sufficiently capable of affecting market conceptions of value. We reject the Township's argument that the judge should have disregarded the well-established standard of requiring a zoning change to be "reasonably probable" and apply a new standard that the zoning change was "possible." We, therefore, hold that the judge did not err in finding that a zoning change was not reasonably probable. We also discern no abuse of discretion in the judge's decision to sever the issues under Rule 4:38-2(a). The judge's

41

decision to address the likelihood of a zoning change as a separate question that preceded other valuation issues was sound.

## VI.

Finally, we address the Township's argument that the judge erred by failing to treat Maser's figure of 425 developable acres as the lower amount for a judicial finding because it was only one-half of what the CAFRA regulations on impermeable coverage allowed and was a conservative estimate in light of "where the theoretical developer would wind up" after negotiating with the DEP. In its cross-appeal, CIBA contends the judge erred in finding that CAFRA regulations would only allow 55.4 acres of the property to be developed. CIBA argues that Kirkpatrick evaluated all the regulated features of the property, such as threatened and endangered species, critical wildlife habitat, wetlands, buffers, riparian zones, intermittent stream corridors, and flood hazard areas. The Township claims CIBA's assertion of only 55.4 developable acres is bereft of support in light of the judge's ruling that CIBA failed to show that the DEP would prohibit development of the 790 acres which the EPA recognized as unrestricted for development. We reject both arguments.

To reiterate, the judge found the DEP would eventually allow development on the 790 acres that the EPA designated as unrestricted. The

A-3963-18

judge prudently noted that all development activity would be precluded until the DEP made those determinations. The second finding rendered it unnecessary for the judge to address or refute the possibility that the feasibility of on-site mitigation, or the opportunity for relevant off-site mitigation, might impel the DEP to approve more or less development than the expert witnesses anticipated.

We are convinced that there is sufficient credible evidence to support the judge's findings of fact and conclusions of law. Norfolk S. Ry. Co. v. Intermodal Props., LLC, 215 N.J. 142, 165 (2013). CIBA and the Township's arguments not addressed herein lack sufficient merit to warrant further comment. R. 2:11-3(e)(1)(E).

Affirmed on the appeal and cross-appeal.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

43                                                                    A-3963-18